IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DAMEIUM DWIGHT BURROUGHS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. PWG-16-518 |
| WARDEN KATHLEEN GREEN, | * | |
| Defendant. | * | |

***

## MEMORANDUM OPINION

Defendant Warden Kathleen Green moved to dismiss or for summary judgment in the above-captioned civil rights case. ECF No. 18. Plaintiff opposes the motion. ECF No. 21. No hearing is required for disposition of the matters pending before the Court. *See* Local Rule 105.6 (D. Md. 2016). Because Plaintiff failed to properly exhaust his administrative remedies before filing this suit, Defendant's motion, construed as a Motion for Summary Judgment, shall be granted.

## Background

Plaintiff Dameium Dwight Burroughs is an inmate committed to the custody of the Maryland Division of Correction and confined in Eastern Correctional Institution (ECI) in Westover, Maryland. He alleges that on January 16, 2016, he was sleeping in his cell when he woke to the sound of someone pulling on the cell door. Compl. 8, ECF No. 1. Burroughs states that the door came open and several inmates ran into his cell and stabbed him twice in the head and "several times" in his side and back. *Id.* During the assault, Burroughs claims his television and his new state-issued clothes were stolen. *Id.*

Burroughs alleges that he had informed correctional officers prior to this incident that it was possible to pull on the cell doors open without a key. *Id*. He claims that he had previously requested that the door be repaired. *Id*.

Burroughs states that on the morning following the assault, members of the Black Guerilla Family (BGF) saw that he was still on the tier and he "had to fight again." *Id*.

As relief Burroughs seeks compensation in the amount of $1,500 and a transfer away from ECI to ensure his safety. *Id*.

Burroughs supplemented the Complaint twice. First Supp. Compl., ECF No. 8; Second Supp. Compl., ECF No. 12. In the first supplemental filing, Burroughs states that his legal papers, which included copies of request slips to have his cell door repaired, were taken from his cell during a search ordered by Warden Green. First Supp. Compl. He further states that he had a color television and a PlayStation 2 stolen from his cell. *Id*. He admits he did not have "paperwork" for the PlayStation 2. *Id*.

In his second supplemental filing, Burroughs filed a copy of a medical record dated January 17, 2016, which indicated that he was seen by Kimberly Malin, RN for "3 superficial abrasions on left abdomen and side" and "one puncture wound on head." Second Supp. Compl. Attach. 1, at 1, ECF No. 12-2.[1] Malin observed that the wounds were healing and there was no evidence of infection. *Id*. In addition, Burroughs filed a copy of an appeal of the Department of Correction's response to an administrative complaint. Second Supp. Compl. Attach. 1, at 3. The appeal concerns the January 16th assault as well as the issue with the cell doors failing to lock. *Id*.

---

[1] Page numbers for citations to the attachments to the Second Supplemental Complaint refer to the CM/ECF page numbers.

Defendant Green asserts, in response to the Complaint, that Burroughs did not properly exhaust administrative remedies and that she is entitled to qualified immunity. Def.'s Mem., ECF No. 18. In addition, Green provides a sworn declaration and verified records that establish that a PlayStation and PlayStation controller on were confiscated from Burroughs on September 21, 2014 and returned to the rightful owner, another inmate. Switalski Decl. ¶ 4, Def.'s Mem. Ex. 1, at 1–3, ECF No. 18-2; Notice of Confiscation, Mot. Dismiss Ex. 1, at 55. At that time, Burroughs was given television on loan. Switalski Decl. ¶ 4; *see also* Notice of Registration, Def.'s Mem. Ex. 1, at 56. Personal property inventory sheets dated January 19, 2015 and January 17, 2016 documenting Burroughs's property do not reflect that Burroughs owned a television or a PlayStation 2. Switalski Decl. ¶ 4; Jan. 19, 2015 Personal Property Inventory, Def.'s Mem. Ex. 1, at 57; Jan 17, 2016 Personal Property Inventory, Def.'s Mem Ex. 1, at 58.

With regard to Cornelius Kilson, the only inmate identified by Burroughs as being responsible for the assault, no records were found to show that inmate presented a threat to Burroughs prior to January 16, 2016. Switalski Decl. Burroughs had no other listed enemies who were housed at ECI prior to the assault. *Id*. On January 27, 2016, an inmate alert was added to Burroughs's base file records indicating that Kilson presented a threat to his safety. *Id*.

Because Burroughs was housed in general population at the time of his assault, no surveillance video of the assault was captured as video surveillance equipment is not present on general population units at ECI. Switalski Decl. ¶ 3. On January 16, 2016, at the time of the assault on Burroughs, the housing tier log reflects that officers "were conducting rounds to monitor security." *Id*. ¶ 6. There is no entry in the log indicating that an inmate-on-inmate assault (denoted as a 10-10) occurred. *Id*.

The following morning, a log entry indicates there was an altercation between Burroughs and Kilson that occurred when correctional officers were electronically opening cell doors on the tier to allow inmates to go to breakfast. Switalski Decl. ¶ 5. The notice of infraction issued to Burroughs and written by Officer D. Schweitzer indicates that Burroughs ran across the tier to Kilson's cell (C-31) when he was released from his cell (C-46). Notice of Inmate Rule Violation, Def.'s Mem. Ex. 1, at 18. Burroughs went into Kilson's cell, throwing punches, and both men came out of the cell engaged in a fist fight. *Id*. Because both men continued to fight after ordered to stop, offers used pepper spray to break up the fight. *Id*. A use of force and serious incident report were later prepared as a result of the incident. Use of Force Report, Def.'s Mem. Ex. 1, at 23–53.

On January 18, 2016, Burroughs was interviewed by Lieutenant Tanicka White, who investigated the use of force. *Id.* at 24. Burroughs told White that on January 16, 2016, during the 3–11 shift and while inmate sanitation workers were out of their cells before the shift change, "a sanitation worker walked down C tier and approached 5 different cell doors and yanked real hard and pulled them opened [sic] while they were secured and/or deadlocked." *Id*. After the inmates in those five cells were released, one of them yanked on Burroughs's door and they rushed into his cell and beat and stabbed him. *Id*. Burroughs also told White that while he was being assaulted another inmate stole his television. *Id*. After the assault, the inmates fled, and Burroughs closed his door and cleaned his wounds. *Id*. He stated that the only one of his assailants he recognized was Kilson because he was the one holding the door. *Id*.

Burroughs admitted that once his cell door was opened for breakfast, he rushed straight to Kilson's cell door and as soon as Kilson's door was opened they began to fight. *Id*. He further admitted that several direct orders were given for them to stop fighting, which were ignored, and

told White that "this was not over because they stabbed him." *Id*. Kilson was also interviewed and denied knowing the basis for Burroughs's assault. *Id*. at 24–25.

Lieutenant White further notes in her report that the "suspect doors" were checked and it was confirmed that they could be opened despite being locked. *Id.* at 25. Lieutenant White prepared a separate report to maintenance for the doors to be repaired "as a matter of urgency." *Id*. A search of the records maintained in Green's office yielded no complaints requesting repairs to Burroughs's cell door filed prior to January 16, 2016. Switalski Decl. ¶ 8. In his declaration under oath, Correctional Maintenance Office Manager Kenny Glasgow reports that no work order requests were received for repairs to any of the doors on cells to which Burroughs was assigned from May 20, 2014 through January 16, 2016. Glasgow Decl. ¶ 3, Def.'s Mem. Ex. 7, ECF No. 18-8. Glasgow states, however, there was a work order (#45150) dated February 15, 2015, reporting that an unspecified cell door on C tier was not securing properly and the repair was completed on February 17, 2015. *Id*. ¶ 4. Glasgow further indicates that work orders are submitted by staff when a repair is needed. *Id*. ¶ 5. A copy of Lieutenant White's work order is not included in the records submitted.

Burroughs filed an administrative complaint known as an ARP on February 2, 2016, concerning the previous month's assault. Burroughs ARP, Def.'s Mem. Ex. 2, at 4–5, ECF No. 18-3. His complaint reads as follows:

> On 1/16/16 I was in my cell laying down when my cell door was opened and several inmates came in my cell. I was stabbed a couple of times (see p.c. and medical file). My RCA color TV was taken etc. My wounds was minor. So at breakfast time I came out and defended myself against my attackers and I was placed on seg. for it and received 90 days and lost of credits of 120 days. If officer was on his post then this could have been avoided. Now I would like to start the process of filing a law suit. This is not the first time an inmate was assaulted due to faulty cell doors and correctional officers not on there post. Just last year down H.U. 7 an inmate on [illegible] tier was sleep when he was attacked and almost lost his life. This institution have people who are not gang

> members on gang tiers and this is the stuff that happens. Inmates who are not gang members or are part of a different gang are targets for there stuff taken or worst assaulted. this is an ongoing problem and the Warden and H.U. Lt. are not addressing these issues, instead forcing inmates to pick up arms and defend themselves. Because traffic or whomever sends the inmate right back to the same situation. I'm going to keep defending myself until this administration solve these problems. I filed an informal complaint and have yet to receive a response. I would like a copy of the pictures taken of my torso wounds and the medical report so I can proceed with civil matters and permission to speak to the press. I don't know the officer name that the tier that night I just know I was in my cell sleep and it was at sanitation time so it was about 10:00 p.m.

*Id*. The ARP was "dismissed for procedural reasons" because "[i]nmates may not seek to resolve a complaint through the ARP for Inmate disciplinary procedures and decisions." *Id*. at 4.

Kristina Donnelly, Executive Assistant to the Department of Public Safety and Correctional Service (DPSCS)'s Executive Director for Field Support Services, states in her declaration under oath that Burroughs filed a headquarters appeal of an administrative remedy response on February 29, 2016. Donnelly Decl. ¶ 2, Def.'s Mem. Ex. 3, ECF No. 18-4. The appeal was reviewed by Correctional Case Manager Specialist II Chantell Session on the day it was received. *Id*. ¶ 3. Burroughs did not include with his appeal a copy of his ARP with the warden's response, as required by the appeal procedures. *Id*. ¶¶ 5–6. Although it was apparently assumed that Burroughs was filing an "Appeal of No Response from Warden," Session "was unable to determine . . . Burroughs' intent" because he had not included "a copy of the original Request for Administrative Remedy signed by a correctional officer suggesting the lack of a response from the Warden." *Id*. ¶¶ 4, 6. Session sent Burroughs a memorandum indicating that his appeal would not be processed because his intent in filing it could not be determined. *Id*. ¶ 7; Memorandum from Chantell Session, Exec. Assistant to Exec. Dir. Field Support Servs., Dept. Pub. Safety & Corr. Servs., to Damerum Burroughs 412320 (Feb. 29, 2016), Donnelly Decl.

Decl. Attach. 1, Def.'s Mem. Ex. 3, at 3. No further attempts to appeal the ARP were submitted by Burroughs. Donnelly Decl. ¶ 8.

A copy of the appeal is not submitted by Defendant, but was provided by Burroughs. Burroughs ARP Appeal, Second Supp. Compl. Attach. 1, at 3. Burroughs indicated on the form that there was no response from the warden. *Id*. The substance of the appeal mirrors the content of the ARP he filed at the institutional level and again requests copies of pictures and medical records so that Burroughs could proceed with a civil suit. *Id*. The appeal neither discussed the response's stated reason for dismissal nor provided any support for Burroughs's contention that his ARP received no response. *See id*.

### Standard of Review

Defendant's dispositive submission will be treated as a Motion for Summary Judgment under Fed. R. Civ. P. 56 because materials outside the original pleadings have been considered. *See Bosiger v. U.S. Airway*s, 510 F.3d 442, 450 (4th Cir. 2007). Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### **Qualified Immunity**

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for public officials for mistakes of law, mistakes of fact, or a combination of the two. *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting). Qualified immunity is a defense from suit, not simply liability, which is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id*. If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir. 2007) (citing *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)). Trial courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Taken in a light most favorable to Burroughs, there is a colorable argument that his Eighth Amendment rights were violated. Burroughs alleges not only that he was housed in a unit where gang members with whom he was not associated were assigned, but also that vital security equipment—the locks on multiple cell doors—was not operational and that Warden Green was made aware of it. Compl. 8. There appears to be no dispute that sanitation workers, who are inmates, had been released from the cells and correctional staff were not present in the area to supervise. Def.'s Mem. 5. Additionally, there is evidence in the record to support Burroughs's claim that serious concerns regarding inmate safety are regularly ignored by the administration at ECI. Burroughs's ARP raised those concerns and was erroneously dismissed; those same concerns were again communicated to the Commissioner of Correction and denied on procedural

grounds. Burroughs ARP, Def.'s Mem. Ex. 2, at 4–5 (complaining of multiple instances of inmate assault in cells with faulty doors and prison's failure to address the cell-door problem); Donnelly Decl. ¶¶ 4–6 (declaring that ARP appeal was denied due to failure to include copy of ARP with an administrative response because it was impossible to infer the basis for Burroughs' appeal); Burroughs ARP Appeal, Second Supp. Compl. Attach. 1, at 3 (indicating that Warden did not respond to ARP). Lieutenant White noted in her report that a work order would be placed to repair the cell doors, Use of Force Report, Def.'s Mem. Ex. 1, at 25, but Glasgow's declaration under oath contains no indication that anything was done to the cell doors following Burroughs's assault, *see* Glasgow Decl. ¶ 3, Def.'s Mem. Ex. 7. Warden Green, who does not provide a declaration under oath, was presumably made aware of the content of the Use of Force Report and her designee reviewed Burroughs's ARP. Donnelly Decl., Def.'s Mem. Ex. 3.

It is well-established that the Eighth Amendment prohibits gratuitously allowing the beating or rape of one prisoner by another" because it "serves no legitimate penologicial objective, any more than it squares with evolving standards of decency." *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (citations omitted). Burroughs claims that Warden Green allowed conditions to exist that created a substantial risk of significant physical or emotional injury. Thus, she is not entitled to avail herself of a qualified-immunity defense. *See Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).

### Exhaustion of Administrative Remedies

Warden Green also asserts the affirmative defense that Burroughs failed to exhaust his claim through the administrative remedy process. Def.'s Mem. 13–17. The Prisoner Litigation Reform Act (PLRA) provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of
> this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

This requirement is one of "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore*, 517 F. 3d at 725.

Exhaustion is mandatory. *Ross*, 136 S. Ct. at 1857; *Jones v. Bock*, 549 U.S. 199, 219 (2007). A court may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000)). The claims asserted must be dismissed if the defendant raises the affirmative defense and also proves that the plaintiff has failed to exhaust available remedies. *See Jones*, 549 U.S. at 216–17.

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003); *see also Booth*, 532 U.S. at 735 (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal

administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F. 3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review). The purpose of exhaustion is to: 1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation. *Jones*, 549 U.S. at 219. An inmate's failure to exhaust administrative remedies is an affirmative defense; defendant bears the burden of proving that he had remedies available to him of which he failed to take advantage. *Jones*, 549 U.S. at 211–12, 216; *Moore*, 517 F.3d at 725.

In *Ross* the Supreme Court identified three kinds of circumstances in which an administrative remedy is unavailable. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

In Maryland, filing an ARP with the warden of the prison is the first of three steps in the ARP process. *See* Code of Md Regs. ("COMAR"), tit. 12 § 07.01.04. The ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the inmate first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR, tit. 12 § 07.01.05.A. If the request is denied, a prisoner has 30 calendar days to

file an appeal with the Commissioner of Correction. COMAR, tit. 12 § 07.01.05.C. If the appeal is denied, the prisoner has 30 days to file a grievance with the Inmate Grievance Office (IGO). *See* Md. Code Ann., Corr. Servs. §§ 10-206, -210; COMAR, tit. 12 §§ 07.01.03, 07.01.05.B.

Grievances are reviewed preliminarily by the IGO. *See* Md. Code Ann. Corr. Servs. § 10-207; COMAR, tit. 12 § 07.01.06.A. If a grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Code Ann., Corr. Servs. § 10-207(b)(1); *see also* COMAR, tit. 12 § 07.01.07.B. An IGO order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. Md. Code Ann., Corr. Servs. § 10-207(b)(2)(ii); however, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-208(c); COMAR tit. 12 § 07.01.07-08. The conduct of such hearings is governed by statute. *See* Md. Code Ann., Corr. Servs. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. A decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* Md. Code Ann., Corr. Servs. § 10-209(b)–(c). The final agency determination is subject to judicial review in Maryland state court, *see* Md. Code Ann., Corr. Servs. § 10-210; however, an inmate need not seek judicial review to satisfy the PLRA's administrative exhaustion requirement. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

In the instant case Burroughs filed an ARP regarding the assault and the conditions that existed which allowed it to occur, and it was dismissed for erroneous reasons. The complaint was dismissed as an improper attempt to use the complaint process to address "disciplinary procedures and decisions." Burroughs ARP, Def.'s Mem. Ex. 2, at 4. Burroughs's complaint did not concern a disciplinary issue; rather, it addressed his alleged assault and the faulty cell doors that made the assault possible. *Id.* at 4–5. Despite the erroneous response to his complaint, Burroughs's appeal did not bring the response's stated reason for dismissal to the Commissioner's attention, and he did not attach the ARP, which included the Warden's response, to the appeal. Instead, Burroughs's appeal incorrectly indicated that he received no response to his ARP without providing any facts to support that contention, such as the date on which the ARP was submitted and the deadline for a response. Even though Burroughs was informed that his appeal would not be processed due to the deficiencies in the form and information presented, there is no evidence that he attempted to correct his submission. And there is no evidence in the record to suggest that Burroughs filed a grievance with the IGO in response to the Commissioner's denial of his appeal. Thus, the claim has not been properly exhausted and must be dismissed.

By separate Order which follows, Defendant shall be granted summary judgment.


January 19, 2017                                    /S/
Date                                                Paul W. Grimm
                                                    United States District Judge